**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

KHARIEH BROS, INC. DBA WALTON HAULING; RDS DELIVERY SERVICE CO., INC.; LIGHTNING EXPRESS DELIVERY SERVICE, INC.; AND NEW YORK STATE MOTOR TRUCK ASSOCIATION, INC., DBA TRUCKING ASSOCIATION OF NEW YORK, INDIVIDUALLY AND BY AND THROUGH ITS MEMBERS,

Plaintiffs,

v.

CITY OF NEW YORK, NEW YORK CITY DEPARTMENT OF ENVIRONMENTAL PROTECTION, AND LISA F. GARCIA, solely ~~personally and~~ in her official capacity as Commissioner of the New York City Department of Environmental Protection~~.~~,

Defendants.

SECOND~~FIRST~~ AMENDED

~~-~~COMPLAINT

Index No. 1:26-cv-05659 (AT~~LGS~~)

(Jury Trial Demanded)

Plaintiffs, Kharieh Bros, Inc. DBA Walton Hauling ("Walton"), RDS Delivery Service Co., Inc. ("RDS"), Lightning Express Delivery Service, Inc. ("Lightning Express"; together with Walton and RDS, the "Motor-Carrier Plaintiffs"), and New York State Motor Truck Association, Inc., DBA Trucking Association of New York, individually and by and through its members, including the Motor-Carrier Plaintiffs ("TANY"; together with the Motor-Carrier Plaintiffs, the "TANY Plaintiffs"), by and through their undersigned counsel, Monaco Cooper Lamme & Carr, PLLC, allege as follows:

## I. NATURE OF THE ACTION

1. This action challenges Defendants' application and enforcement of New York City Administrative Code § 24-163 (the "Idling Law") and New York City Administrative Code § 24-182, the Citizens Air Complaint Program ("CACP").

2. The New York City Department of Environmental Protection ("DEP"), through its Commissioner, has established the CACP to prosecute alleged Idling Law violations.

3. DEP administers the CACP under an enforcement regime in which privately owned trucking companies, most of which, including all of the Motor-Carrier Plaintiffs, are regulated by the Federal Motor Carrier Safety Administration ("FMCSA"), are issued summonses and prosecuted before the New York City Office of Administrative Trials and Hearings ("OATH"), New York City's administrative law court. The TANY Plaintiffs are being subjected to costly proceedings, monetary penalties, and fines under circumstances and procedures that violate their constitutional rights as provided further herein.

4. At the same time, city and state owned and/or operated motor vehicles that Defendants acknowledge are "subject to the same idling regulations" have summonses and complaints issued against them administratively dismissed and are thereby spared OATH prosecution, monetary fines, and penalties pursuant to Defendants' published and adopted enforcement policy.

5. The TANY Plaintiffs allege that Defendants enforce the CACP through OATH in a manner that (i) denies privately owned trucking companies substantive due process and equal protection of the laws, (ii) deprives them of property without constitutionally adequate procedural due process, (iii) imposes unconstitutional burdens on interstate commerce, and (iv) penalizes conduct that, in the circumstances alleged herein, can be reasonably necessary to comply with

federal law, including FMCSA and OSHA safety requirements, and/or federal environmental protection and Clean Idle standards. The claims of the TANY Plaintiffs arise under the Equal Protection, Due Process, Commerce, and Supremacy Clauses of the United States Constitution, and Article I, §§ 6 and 11 of the New York State Constitution.

6. The TANY Plaintiffs are motor carriers regulated by the FMCSA and are subject to the Federal Aviation Administration Authorization Act, which protects federal deregulation of trucking, and federal Motor Carrier Safety Regulations ("FMCSRs"), including regulations governing driver obligations and record retention. See, e.g., 49 CFR §395.3(a)(2) (regulating hours of service). In addition, the federal Clean Air Act contains opportunities for truck manufacturers to meet Certified Clean Idle standards to obtain certain regulatory benefits. The TANY Plaintiffs respectfully submit that to the extent the CACP and the Idling Law, as implemented by DEP, are inconsistent with (i) the ability of motor carriers to employ equipment that meets federal Certified Clean Idle standards, and (i) the FMCSRs determined by the U.S. Department of Transportation ("DOT") to be preemptive, they are preempted.

7. Defendants' enforcement policy operates to pursue alleged violations and imposes significant monetary penalties on privately owned FMCSA-regulated trucking companies engaged in interstate commerce. The Idling Law does not exempt Defendants' motor vehicles from its prohibitions. Nevertheless, Defendants' enforcement policy shields non-exempt City/State vehicle fleets, which are subject to the same law, from similar enforcement actions, fines, and penalties.

8. Defendants' administration of the Idling Law, through the imposition of fines and penalties, impedes Plaintiffs' ability to operate in compliance with the FMCSRs. Consequently, Defendants' application of the Idling Law threatens the continued delivery and viability of trucking

services in interstate commerce to and within New York City, and relates to prices, routes, and services of motor carriers.

9. The TANY Plaintiffs challenge Defendants' enforcement policy because it denies them equal protection and due process and, as applied in the circumstances alleged herein, penalizes idling necessary to produce the electricity necessary for the proper use of their lift gates and processing devices, to comply with hours-of-service requirements, and to employ equipment required for participating in the federal Certified Clean Idle program. This directly or indirectly conflicts with FMCSRs and operating requirements of Certified Clean Idle equipment, and can force the Motor Carrier Plaintiffs to choose between violating the Idling Law and failing to comply with FMCSA safety regulations and/or procedures for operating Certified Clean Idle equipment.

10. The TANY Plaintiffs allege that Defendants:

(a) selectively enforce the Idling Law and CAC/OATH monetary-penalty regime against privately owned FMCSA-regulated motor carriers while shielding city- and state-owned/operated public fleets from equivalent monetary enforcement;

(b) administer a bounty-driven complaint system that financially rewards private complainants when penalties are imposed without adequate safeguards for due process;

(c) impose recurring fines, defense costs, stipulation pressure, and operational burdens on the TANY Plaintiffs' interstate and intrastate transportation services; and

(d) distort competition and burden interstate and intrastate transportation to, from, and through New York City.

11. In this case, the TANY Plaintiffs challenge Defendants' policies and practices that subject privately owned motor carriers to unequal monetary enforcement and adjudicatory burdens, in violation of the Equal Protection Clause, the Due Process Clause, the Supremacy Clause, and the Commerce Clause of the United States Constitution, and 42 U.S.C. § 1983.

12. The TANY Plaintiffs are entitled to relief, jointly and severally, because their claims arise from Defendants' typical actions—specifically, the application and enforcement of the NYC Idling Law, the CACP, and related OATH procedures, as applied to and enforced against the TANY Plaintiffs' interstate and intrastate motor carrier operations in New York City.

13. Defendants have implemented and enforced regulatory measures, policies, and practices that:

- target privately owned interstate and intrastate motor carriers while shielding public carriers and non-exempt City vehicles; and
- impose illegal restrictions on access to New York City and operations therein.

These actions violate:

- The Equal Protection Clauses of the New York State and United States Constitutions.
- The Due Process Clauses of the New York State and United States Constitutions.
- Plaintiffs' rights under 42 U.S.C. § 1983;
- Applicable federal and state laws protecting against unlawful interference with business operations, motor carrier prices, routes, and services; and
- The Supremacy Clause of the United States Constitution.

14. Section 24-163, as applied and enforced by Defendants, prohibits idling for more than three minutes, subject to stated exceptions; imposes a one-minute limit in specified school and park-adjacent areas; and enforces a zero-tolerance idling rule at terminal points. The statute

exempts legally authorized emergency vehicles from its prohibitions but does not create a public ownership carveout for enforcement, as reflected in DEP's published CAC guidance and in DEP's enforcement of the Law.

## II. PARTIES
### A. The TANY Plaintiffs

15. TANY is a not-for-profit trade association representing the interests of the trucking industry in New York State. TANY advocates on behalf of the trucking industry with respect to policies that may affect motor carriers.

16. TANY's members represent a diverse class of motor carriers, ranging from single truck owner-operator companies to large national fleets with a business presence in New York State. TANY shares its members' interests in ensuring that they are not unconstitutionally and selectively targeted for violations of municipal ordinances.

17. Walton is a TANY member and a motor carrier that operates out of Greenpoint, Brooklyn, and it serves the transportation needs of the film & television industry. For over 135 years, Walton has provided efficient and safe transportation services in interstate commerce through its quality equipment and solidarity with the International Brotherhood of Teamsters - Local 817 who drive its trucks.

18. RDS is a TANY member and a trusted same day messenger and delivery service that began its operations with a focus on serving time-critical medical deliveries. It operates in all five boroughs of the City of New York and in interstate commerce throughout the tri-state metropolitan area. Today, the company adopts the latest technology and practices for its clients' benefit in an expanded area of reach, which now includes retail, fashion, advertising, and medical industries.

19. Lightning Express is TANY member and a small business dedicated to providing excellent cargo delivery service in interstate commerce through a variety of secure transportation options. Using trucks and vans, the company offers local and long-distance shipping.

20. Walton, RDS, and Lightning Express are FMCSA-regulated motor carriers authorized to transport goods in interstate commerce across the United States. In the normal course of their operations, their trucks and vans enter the City of New York, use public streets and curb spaces, and stop to load, unload, and service goods. Each is a TANY member and operates trucks that require entry into and movement within New York City and includes service stops in New York City, using the same streets, and public curb locations as public entity motor carriers operating transportation services in New York City.

21. TANY and its membership, including the Motor-Carrier Plaintiffs, support the policy of reducing pollution and improving our environment.

22. For example, Walton's entire operating fleet is Certified Clean Idle equipped with advanced emissions controls that meet strict limits on smog-forming pollutants like nitrogen oxides (NOx) and particulate matter (soot) during low-RPM operation. Each truck in Walton's operating fleet displays a plainly visible sticker that identifies its status as Certified Clean Idle.

23. In addition, Walton has voluntarily made independent arrangements to fuel its fleet entirely with RD99 diesel fuel made from repurposed animal fats, used cooking oils, and agricultural waste. As a result, Walton's operating fleet burns no fossil fuels, and its greenhouse emissions are reduced by more than 50% as compared to standard #2 diesel.

24. In California, Certified Clean Idle equipped fleets, like Walton's, are exempt from the local idle law because, quite simply, they are operating with such advanced emission control systems. Nevertheless, in New York City, carriers with the same type of Certified Clean Idle equipment, like Walton and other TANY members, have been, are being, and/or are facing a continuing credible threat of being subjected to the challenged CACP/OATH enforcement policies, resulting in significant economic and operational harm due to the unlawful manner in which DEP

is implementing the CACP through bounty hunters.

25. Defendants' enforcement of the Idling Law through the CACP in New York City affects all TANY members by increasing their risks of unlawful enforcement through exposure to private bounty-hunter complaints. As a result, motor carriers are required to make inefficient fleetwide operational and routing changes on account of a municipal idling regulation.

**B. Defendants**

26. Defendant City of New York is a municipal corporation organized under New York State law.

27. Defendant DEP is a city agency responsible for enforcing environmental laws and regulations in the City of New York.

28. Defendant Lisa F. Garcia, the Commissioner of the DEP, is sued solely in her ~~personal and~~ official capacity~~ies~~.

29. At all relevant times, the challenged CACP enforcement practices, including how city and state vehicles were treated under DEP's published guidance, constitute official municipal policy, custom, or practice implemented under color of state law.

## III. JURISDICTION AND VENUE

30. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this case involves the United States Constitution and 42 U.S.C. § 1983.

31. The Court has supplemental jurisdiction over related state law claims under 28 U.S.C. § 1367.

32. Venue is proper in this District under 28 U.S.C. § 1391 because the Motor-Carrier Defendants and much of TANY's membership resides here and a substantial part of the events giving rise to the claims occurred in this District.

## IV. FACTUAL ALLEGATIONS

### A. The Bounty-Hunter Program

33. Defendants administer New York City Administrative Code § 24-163 through DEP and the CACP, under which private citizens, "bounty hunters," submit idling complaints that can lead to OATH prosecutions and monetary penalties.

34. Under the CACP, private individuals can file "bounty-hunter" complaints alleging violations of the Idling Law. These complaints regularly result in monetary penalties enforced through OATH proceedings. A significant percentage of the fines and penalties recovered under the CAC program is then paid to the bounty hunter.

35. The overwhelming majority of purported violations of the Idling Law today are initiated through the filing of a citizen's complaint, not through centralized enforcement by the Department. On information and belief, before the enactment of the CACP, City officials had to enforce idling violations, and there were only approximately 6 summonses issued per day (or approximately 2000 per year). After the City enacted the provisions that permit complainants to prosecute cases in OATH and seek a 50% bounty, the number of complaints jumped to 124,000 in 2024.

36. The bounty-hunter program was originally intended to assist with public enforcement by encouraging honest citizens to make bona fide complaints when they observe unlawful idling.

37. Instead, it has exploded into a cottage industry of highly compensated enterprises which literally now have employees engaged in bounty hunting, and upon information and belief, obtain administrative assistance in filing their myriad complaints from questionable off-shore providers.

38. Because the DEP has construed the private enforcement provisions as limited to commercial vehicles, which are typically identifiable with trade markings, the provisions are frequently used by citizens with bias or animus against certain companies or corporate interests.

39. To make matters worse, the CACP does not include the necessary procedural safeguards to prevent abuses and to allow motor carriers and vehicle fleet owners, such as the TANY Plaintiffs, to defend themselves against bogus complaints.

40. As a result of the challenged regime, privately owned motor carriers and vehicle fleet owners, including the TANY Plaintiffs, incur fines, stipulation payments, attorney time, hearing costs, and operational burdens that are not imposed on city and state fleets through the same OATH monetary process.

41. For example, from August 2022 through the filing date, Walton has been issued over 273 citations. Despite investing significant time and resources in attempting to defend itself at the OATH hearings, it has been required to pay over $123,000 in fines due to the lack of procedural due process afforded by the CACP, even though Walton's entire operating fleet is equipped with Certified Clean Idle equipment that emits no emissions at idle.

42. Walton and the other Motor-Carrier Plaintiffs are confronted at OATH hearings with videos taken by bounty hunters who are not present at the hearing for cross examination. These videos do not provide sufficient data to allow for a determination of whether lift gates and other processing devices were being deployed, and the delay in issuance of the summons prevents the TANY Plaintiffs from conducting proper investigations.

43. The drivers may no longer be employed, or their memories simply lack the ability to recollect the circumstances that were taking place at one of thousands of delivery stops occurring many months in the past.

44. To make matters worse, the summonses are issued to the vehicle owners, who are not necessarily the operators. In those circumstances, the owners are one-step further removed from operational process and do not even have employment control over the employees of the operator.

45. In many instances, the videos are taken under suspicious circumstances and opportunities for fraud are inherent in the process. The advent of AI exasperates the opportunity for the bounty hunters to fabricate evidence.

46. Because the bounty hunters are not available for cross examination, the TANY Plaintiffs' are deprived of the opportunity to challenge the reliability of the videos and the overall veracity of the complaints, or the authenticity of the evidence.

47. Further complicating the problem, the CACP requires uploaded videos to be compressed, which adulterates their integrity and reliability.

48. The bounty hunters often delay their uploading of videos for extended periods of time, and once uploaded, DEP further delays its review of them and its issuance of summonses to motor carriers.

49. Those circumstances, coupled with the extreme delay in the issuance of summonses and the scheduling of hearings, make it virtually impossible for the Motor-Carrier Plaintiffs to obtain the necessary evidence to undertake a meaningful defense.

50. In addition, the Motor-Carrier Plaintiffs are being processed as repeat offenders before they even learn about their first alleged offense. This prevents them from investigating and taking remedial action, if warranted, to avoid the steep escalation in fines associated with repeat offender status.

51. For example, attached as **Exhibit A** is a chart prepared by RDS which illustrates the magnitude of the delay between the alleged violation date and the hearing date. In many cases there is a delay of well over a year, and in one case it exceeded two years.

52. These types of delays deprive the TANY Plaintiffs of any meaningful opportunity to defend themselves against wrongful claims and it traps and prevents them from being able to avail themselves of early resolution opportunities afforded under the CACP, and/or avoiding escalating penalties, and/or otherwise taking remedial measures to address any legitimate issues that might be present.

53. Upon information and belief, since at least 2020, Defendants have issued tens of thousands of CAC summonses against privately owned motor carriers and interstate transportation companies operating in New York City.

54. Those fines and associated administrative burdens significantly increase the cost of providing interstate motor carrier transportation to, from, and through New York City.

55. These summonses have led to significant financial penalties imposed by the Defendants, including fines, fees, and related administrative costs.

56. The TANY Plaintiffs provide essential transportation services to New York City and its residents and businesses, yet the enforcement regime's challenges burden this vital transportation mode in violation of their constitutional rights to procedural and substantive due process and equal protection.

57. As a direct result of the challenged enforcement disparity and unlawfulness, the TANY Plaintiffs have incurred significant fines, legal expenses, and operational difficulties.

58. These burdens are especially significant because the TANY Plaintiffs' intrastate and interstate operations depend on continued access to New York City streets, curb space, terminals, loading zones, and staging areas to serve the public.

59. In CACP proceedings before OATH, the TANY Plaintiffs are subjected to an administrative adjudication process that imposes or facilitates monetary penalties, while, as a practical matter, constitutional objections to the legality of the enforcement regime are not fully adjudicated in that forum.

60. The TANY Plaintiffs are therefore required to incur additional expenses and delays to pursue judicial review of constitutional objections outside the OATH process.

61. Even when the TANY Plaintiffs have prevailed at their OATH hearings, the complainants are able to pursue appeals without proper or timely notifications to the motor carriers.

62. Upon information and belief, and notwithstanding all of the unlawful features of the current CACP, the New York City Council is now considering legislation that would substantially increase fines for idling violations under the CACP enforcement regime.

63. Policymakers have not sufficiently evaluated the legality of outsourcing enforcement to private citizens. The profit motive fueling the bounty program has spawned a cottage industry of highly compensated private bounty hunters which skews enforcement priorities, lacks the ethical safeguards applicable to traditional prosecutorial bodies, and leads to arbitrary actions, fraud, and corruption, which is made all the worse with the advent of artificial intelligence.

64. A bounty-hunter enforcement mechanism for the Idling Law in an administrative forum with minimal protections and only deferential judicial review is highly unusual, and possibly unprecedented.

## B. The Need for Trucks to Idle

Pollution Control Systems

65. It is no small irony that in many circumstances, trucks often need the engine running to operate their pollution control systems.

66. Modern diesel trucks, which are Certified Clean Idle, use engine-driven regeneration to maintain exhaust system operation by scrubbing and burning off pollutants so that they do not enter the atmosphere. Often, emission-related regeneration must occur while a vehicle is parked and running.

67. The regeneration process is not directly controlled by the driver but by a computer program designed by the engine manufacturer to reduce engine emissions. It is computer initiated and depends on the buildup of particulate matter from engine operation.

68. Thus, idling is often required by modern trucks to avoid engine emissions. Indeed, for that reason, in California, Certified Clean Idle trucks are exempt from its local idle regulations.

Activities Necessary for Transportation and Delivery

69. Truck drivers need to operate their trucks at idle to produce the electricity necessary to maintain the use of their trucks' lift gates and other processing devices, such as, for example, refrigeration systems, concrete mixers, hydraulic booms and cranes, and vacuum and pumper equipment. These tools are critical to the transportation process.

70. For example, it is not unusual for a truck to make 10 to 15 stops per day, sometimes with distances less than a mile apart, with each stop requiring 6 to 10 operations of the liftgate to load or unload the freight shipment.

71. Under these circumstances, idling is necessary to divert the engine power necessary for generating electricity that allows operators to complete jobs, maintain cargo integrity, and/or support critical onboard safety equipment.

Compliance with Federally Mandated Safety and Hours of Service Requirements

72. The Occupational Safety and Health Administration ("OSHA") requires trucking companies to maintain safe and healthful working conditions for their drivers. In addition, the DOT requires trucking companies to adhere to service-hour requirements.

73. Truck drivers require electric and HVAC systems to be operational for an environment in the cab that is conducive for preventing temperature-related illness and/or obtaining their necessary rest to comply with service-hour requirements set forth in 49 CFR § 395.

74. Without HVAC and elective systems necessary to operate important medical equipment, such as CPAP machines, drivers cannot obtain the proper rest they need during their off-service time for their health and safety, thus defeating the purpose of the federal regulation.

**C. Impact on National Transportation and Commerce**

75. As applied in New York City, Defendants' enforcement regime penalizes conduct that is necessary for operational requirements and to comply with federal safety obligations.

76. At the core of the issue is the City's Idling Law, which fails to account for the operational needs of modern commercial motor vehicles.

77. Drivers cannot always shut down the engine immediately upon arrival.

78. In practice, operational and equipment-related requirements may require the engine to run or idle for periods that can exceed the Idling Law limits in certain locations or circumstances.

79. New York City's application of the Idling Law to privately owned motor carriers conflicts with federal statutes and regulations applicable in the transportation industry.

80. The TANY Plaintiffs allege that the challenged regime is being used not merely to regulate emissions but also to impose ownership-based and operationally unfeasible burdens on privately owned motor carriers.

81. For example, to obtain the necessary stickers for the exemptions applicable to processing devices, motor carriers are required to make separate appointments with DEP to have each truck inspected, and, upon information and belief, the backlog in granting appointments can span many weeks.

82. As another example, to be eligible for the lift gate exemption, the DEP requires that the lift gate be actively operated during the idle. Idling before or after active loading is still considered by the DEP to be a violation, even though pre- and post- operation idling is required to complete the charging of the batteries necessary to operate the lift gate.

83. Defendants administer New York City Administrative Code §§ 24-163 and 24-182 through DEP and the CACP, under which private citizens, "bounty hunters," submit idling complaints that can lead to OATH prosecutions and monetary penalties.

**D. Unlawful and Discriminatory Enforcement**

84. DEP's official CACP guidance states that city and state owned or operated vehicles are "subject to the idling regulations," but that a summons issued to them is to be "administratively dismissed" and "no monetary penalty collected." The City's announced public policy is:

**"Are there any situations where a respondent does not have to pay the penalty?**

"City vehicles are subject to idling restrictions, but without monetary penalties imposed by OATH. If you observe idling by a City vehicle, you may send the name of the agency and the license plate number to **nycidling@dep.nyc.gov**, so we may bring the matter to the attention of that agency."

On the DEP website, the Commissioner publicly and formally advises citizens:

"**What vehicles can a Citizen file an idling law complaint against?**

"City and/or state vehicles are not subject to OATH penalties."
(See. Citizens Air Complaint Program, NYC Department of Environmental Protection https://www.nyc.gov/site/dep/environment/idling-citizens-air-complaint-program.page)

85. DEP's official public CACP guidance enforces the Commissioner's unsupported application of the Idling Law, which prohibits OATH from prosecuting City vehicles that violate the Law, and asserts, contrary to the text of the statute, that **"[c]ity and/or state vehicles violating the Idling Law are not subject to OATH penalties."**

86. The Idling Law regulates idling by non-exempt commercial and publicly owned motor vehicles in New York City.

87. The City's public statements regarding CACP enforcement are consistent with, and evidence of, that policy.

88. The Motor-Carrier Plaintiffs operate combustion-engine trucks and vans in New York City as part of intrastate and interstate transportation.

89. City-, state-, and publicly affiliated fleets also operate non-emergency combustion-engine vehicles and heavy-duty non-exempt idling-law vehicles in New York City.

90. The TANY Plaintiffs and those public fleets use public streets, curb space, loading zones, staging areas, and terminal points, and are similarly situated in material respects relevant to enforcing § 24-163 and § 24-182.

91. Section 24-163 does not provide a general exemption for non-emergency city- or state-owned vehicles, nor does it shield against enforcement or monetary penalties based on whether the vehicle is publicly or privately owned. Thus, the DEP's enforcement policy reflects a public/private ownership-based policy not found in the text of § 24-163 or § 24-182.

92. Nevertheless, privately owned motor carriers are subject to CACP/OATH monetary enforcement, whereas city and state owned or operated fleets are administratively exempt from OATH monetary liability on an ad hoc basis under DEP's published policy.

93. By contrast, the TANY Plaintiffs and similarly situated privately owned interstate and intrastate carriers (even if they are operating Certified Clean Idle equipment) are:

- Required to defend CACP summonses before OATH in time-consuming proceedings without being afforded constitutionally mandated procedural due process
- Subjected to monetary penalties upon adjudication
- Denied the benefit of administrative dismissal
- Exposed to escalating financial liability for repeated alleged violations in many cases before they are even aware of the alleged first violation

94. This disparity in enforcement is systemic, consistent, and ongoing, resulting in a two-tier enforcement regime.

- One applicable to privately owned interstate carriers, involving investigation, prosecution, defense, and investigative costs, as well as monetary penalties
- One applicable to publicly owned or affiliated fleets, involving non-enforcement through administrative dismissal or declinations to prosecute of vehicles expressly subject to the Idle Law

95. Upon information and belief, disparate treatment is carried out pursuant to formal and/or informal ad hoc policies that are approved, implemented, ratified, or knowingly tolerated by final DEP policymakers.

96. This disparity in treatment is systemic and ongoing, creating a two-tier enforcement regime: one for privately owned carriers, involving summonses, adjudication, stipulation pressure, and monetary penalties; and another for city and state fleets, involving declinations to prosecute or administrative dismissal by OATH and monetary penalties.

97. Upon information and belief, such declinations to prosecute or administrative dismissals are carried out at the direction of or with the approval of the Commissioner of DEP, or in accordance with policies and practices adopted and ratified by that office.

98. Consequently, Defendants enforce the statute unevenly across public and private fleets in New York City.

## V. CLAIMS FOR RELIEF

**FIRST CLAIM**
**Procedural Due Process**
**42 U.S.C. § 1983**
**(Against All Defendants)**

99. The TANY Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein at length and make the same a part hereof.

100. This claim is brought under 42 U.S.C. § 1983 to address the deprivation, under color of state law, of rights protected by the Due Process Clauses of the New York State Constitution and the Fourteenth Amendment to the United States Constitution.

101. The TANY Plaintiffs possess protected property interests in their money, business assets, and ongoing business operations, including freedom from unconstitutional monetary penalties and coercive settlements imposed by an unfair enforcement regime that fails to provide them with reasonable notice and a meaningful opportunity to be heard.

102. The CACP's near-complete outsourcing of enforcement of the Idling Law to self-interested private citizens "bring[s] irrelevant or impermissible factors into the prosecutorial decision," Marshall v. Jerrico, 446 U.S. 238, 249 (1980), violates the basic due process "requirement of a disinterested prosecutor," Young v. U.S. ex rel. Vuitton et Fils S.A., 481 U.S. 787, 808 (1987), and impermissibly vests executive power in private citizens. Whereas a City official may need to answer for selective enforcement decisions, private citizens typically do not have to answer for such biases. And private citizens often have no personal or cognizable injury from the alleged idling violations, but instead pursue alleged violations for personal profit. The serious "injustice" that "may result from prosecution of a violation of [a local] ordinance upon the complaint of a private citizen" offers strong reason to doubt that the New York legislature has

conferred authority on the City to create such a bounty scheme at all. City of New Rochelle v. Beckwith, 268 N.Y. 315, 317-19 (1935).

103. That unauthorized and unconstitutional scheme gives rise to serious due process violations. Private citizens' self-interested prosecutions occur before administrative tribunals that give respondents patently inadequate procedures to defend themselves. Under the CACP, an issuing officer, who never personally observed the alleged idling incident that gave rise to the alleged violation, affirms the citizen "Bounty Hunter" complaint under penalty of perjury, relying solely on the compressed and uploaded short phone video clip supporting the complaint. The burden of proof then immediately shifts to the respondent to refute the complaint and to prove an affirmative defense by a preponderance of the evidence.

104. The process of compressing a video can change the sounds being recorded. The metatags are removed. Upon information and belief, DEP might be using bots to evaluate the sound recorded in the video and to resolve ownership issues. There is no chain of custody available to the TANY Plaintiffs to be evaluated for authenticity and veracity.

105. Cross examination of the bounty hunter is rarely available because their attendance at the OATH hearings is routinely excused by the Defendants.

106. Meanwhile, the Defendants rely on citizen-submitted video that may lack operational context, including context for loading, unloading, staging, accessibility procedures, equipment testing, and other legitimate motor vehicle activity, including the use of processing devices.

107. Indeed, engine idling is required to generate the electricity necessary to operate the liftgates on trucks during loading and unloading. Depending on the size of the load, a dozen or more operations of the gate can be required at each stop. The existence of a liftgate (and whether

it is being operated) is frequently not captured in the citizen-submitted videos even though the operational and charging status of the liftgate is directly relevant to the question of whether a motor carrier is violating the Idling Law.

108. The citizen's phone video clip is generally a short recording with a limited field of view. Was the truck idling to operate a processing device, such as a liftgate, as discussed above? Was it idling due to regeneration (which is computer-controlled to reduce engine emissions, over which the driver has no operational control and can occur at any time)? Was the driver seeking to maintain an ambient temperature due to severe cold or heat?

109. The entire process, "outsourcing" police power to unnamed private citizens, who are not public officers sworn to uphold the law or bound to ethical and disciplinary principles applicable to law enforcement professionals, and who are financially motivated to collect fines, coupled with a diminished burden of proof and an unfair and predetermined adjudication process (*prima facie* summons, plus bounty, no meaningful cross-examination), resulting in the application of penalties and fines, is applied in an arbitrary and inconsistent manner to deprive the TANY Plaintiffs of their constitutionally protected due process rights.

110. OATH convictions are based on the permissive use of short video clips, reviewed and approved by an issuing officer that was not present at the time of the alleged event and has no firsthand knowledge of it. Defendants also routinely waive the issuing officer's attendance at the hearing, which exacerbates the unfairness to the cited motor carrier.

111. The produced video includes an editable timestamp and is compressed and often cropped to omit loading, unloading, and safety-check context. Defendants collect the contact information for the issuing officer and the citizen complainant and notify them that "you may need to testify."

112. Motor carriers' ability to undermine the video evidence is limited. Where a video has been presented, Defendants' procedures establish that it is not fatal to the summons that it does not clearly show the vehicle vibrating, producing visible emissions, or making audible engine noise.

113. To further prejudice the motor carrier, the summonses are not dated, and there is no mention of what files, if any, the DEP inspector reviewed or relied upon to authenticate or validate the bounty hunter's video. Nevertheless, the issuance of the summons is deemed *prima facie* evidence, sufficient to shift the burden of proof to the respondent at the hearing, rarely providing the respondent with a reliable opportunity to confront and cross examine at the hearing.

114. OATH requires the respondent to make a specific offer of proof showing that cross examination could materially affect the outcome of the case, a condition precedent to requiring the witness's appearance and cross-examination.

115. The OATH rules permit a summons to be admitted as *prima facie* evidence of the violation (*see* 48 RCNY section 6-12(b)), and the burden of proof requires only a preponderance of the evidence.

116. The *prima facie* asymmetry imposed under 48 RCNY section 6-12(b) strongly favors the bounty hunter, who is not required to appear to offer testimony or be subjected to cross examination, and disfavors the respondents, who are prejudiced.

117. The respondent in the proceedings has no meaningful opportunity to cross-examine the bounty hunters, because their appearances to prove the elements of the cause of action pleaded in their complaints are not required for conviction.

118. The respondent is also severely restricted by limited discovery and substantial delays in Defendants' notification and service of summons.

119. Consequently, motor carriers are confronted with drivers' fading memories of the event due to substantial delays in process service, resulting in lost opportunities to identify and develop defense witnesses. In addition, because the Idling Law holds registered vehicle owners financially responsible even if they cannot directly control or police every driver's on-the-street actions at every moment (such as, for example, when vehicles are leased by their operators), the vehicle owners are further prejudiced by the delays in process service because they need to mount their defense through or with the assistance of parties that they do not directly control. The passage of time greatly impedes the ability of non-operating vehicle owners to defend against these claims.

120. Respondents are prejudiced by this requirement because the substantial delay in Defendants' service of the summons, which often occurs well over a year after the alleged incident, substantially hampers respondents' ability to investigate the allegations, identify the driver, locate potential witnesses, and reconstruct the circumstances that may have led to the alleged idling. Because notice is delayed, the TANY Plaintiffs cannot preserve or retrieve contemporaneous exculpatory evidence, including electronic data, dispatch records, internal video, and witness recollections.

121. The delays are further prejudicial because the summonses are issued to vehicle owners, who are not always the vehicles' operators. This can result in incorrect fleet identification, and an inability of the vehicle owner to transfer liability to an operator.

122. Nor is the respondent permitted to conduct sufficient discovery. Discovery is limited by 48 RCNY Section 6-07 to the witness list and the documents DEP intends to use at the hearing to prosecute the case (primarily the video clip and the complaint).

123. Defendants, through the CACP, routinely delay service of summonses for alleged idling violations for many months after the alleged violations occur.

124. Upon information and belief, those delays typically range from approximately six to twelve months or more.

125. The TANY Plaintiffs' records show repeated delays between the alleged violation dates and the service dates. In addition, it appears that summonses are being bunched together, rather than be issued at the earliest reasonable time. This bunching prevents the respondent from investigating and taking potential remedial action, if needed, to avoid the increased fines associated with being a repeat offender.

126. These delays are systemic and recurring, not isolated.

127. Federal regulations require motor carriers to retain records of duty status and support documents for six months. *See* 49 C.F.R. § 395.8(k)(1). In addition, telematics, GPS, engine, and related vehicle data are routinely overwritten in the ordinary course of business before delayed summonses are served.

128. In addition to the delay in issuing the summonses, the Defendants routinely conduct service through the New York State Secretary of State (as opposed to directly the vehicles registered owner), a process that further magnifies the delay in providing notice to the motor carrier and results in greater fines.

129. The cumulative result is substantial prejudice to the TANY Plaintiffs' ability to investigate and to defend against the allegations.

130. The Due Process Clauses of the New York State and United States Constitutions require that a party be afforded a meaningful opportunity to be heard "at a meaningful time and in a meaningful manner." In assessing whether process is constitutionally sufficient, courts consider (i) the private interest at stake, (ii) the risk of erroneous deprivation under the procedures used, and (iii) the governmental interest, including administrative burdens.

131. As applied to TANY Plaintiffs' privately owned motor carriers, Defendants' process does not provide a meaningful opportunity to litigate the factual issues in dispute, to challenge the constitutional validity of the enforcement regime, or to challenge the deprivation of the TANY Plaintiffs' money and property.

132. The risk of erroneous deprivation is heightened by Defendants' public owner/operator carveout, bounty-driven complaint incentives, and service delays that impede access to exculpatory evidence before the TANY Plaintiffs receive notice.

133. Under the circumstances alleged herein, the process afforded is neither fair, neutral, nor meaningful. The complaint system requires no verification and cannot be challenged with contemporaneous evidence. Improprieties in the complaint documentation, which, upon information and belief, in some cases is potentially processed from off-shore locations, are legion.

134. The challenged process is further rendered arbitrary and unfair by Defendants' extra-statutory public owner/operating carveout, bounty-driven complaint incentives, and administrative practices that shield publicly owned fleets from equivalent monetary penalties while privately owned carriers are pursued through CAC and OATH enforcement.

135. Essentially, the OATH process has become a "legal dead end." By the time a party reaches a forum that can hear constitutional arguments (such as this District Court or a New York CPLR Article 78 proceeding), the property (the fine money) has already been seized, or the "record" from OATH is compromised due to the incomplete record.

136. As a direct and proximate result of Defendants' conduct, the TANY Plaintiffs have suffered and continue to suffer unlawful monetary losses and irreparable harm.

137. Defendants' conduct violates the Due Process Clause of the New York State Constitution and the Due Process Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

**WHEREFORE**, the TANY Plaintiffs request judgment against Defendants on Claim II, along with declaratory and injunctive relief, compensatory damages for the Motor-Carrier Plaintiffs, attorneys' fees, and costs under 42 U.S.C. § 1988, and such other relief as the Court deems just and proper.

**SECOND CLAIM**
**Procedural Due Process (Prejudicial Delay in Enforcement)**
**42 U.S.C. § 1983**
(Against All Defendants)

138. The TANY Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein at length and make the same a part hereof.

139. This claim is brought under 42 U.S.C. § 1983 to address the deprivation, under color of state law, of rights protected by the Due Process Clauses of the New York State Constitution and the Fourteenth Amendment to the United States Constitution.

140. Defendants, through the administration of the CACP, routinely delay the service and prosecution of summonses issued for alleged violations of New York City Administrative Code § 24-163 by six to more than 12 months. This delay leaves operators with no ability to investigate or mount a defense, and deprives them of an opportunity to take timely corrective action.

141. These systemic delays undermine the reliability and fairness of the adjudicative process before the OATH in the following ways (among others):

- Impairing accurate fact-finding by degraded or unavailable evidence
- Preventing the TANY Plaintiffs from presenting contemporaneous records necessary to evaluate alleged violations
- Increasing the likelihood of erroneous determinations based on incomplete or one-sided evidence

These are not isolated, unusual, or nonconforming service events but typical features of the CACP.

142. Defendants have not implemented procedures reasonably designed to mitigate the prejudice caused by delayed enforcement, such as requiring timely service of summonses, preserving or requesting relevant electronic data upon complaint submission, or providing mechanisms to account for the routine loss of time-sensitive operational records.

143. The prejudice to the TANY Plaintiffs caused by these service delays is compounded by federal record-keeping retention requirements. Under the Electronic Logging Device ("ELD") Mandate (49 C.F.R. § 395, Subpart B), regulated motor carriers must maintain digital records of vehicle operations. However, the automated hardware and software systems used to comply with these federal rules, along with industry-standard telematics (GPS, engine, and diagnostic data), typically overwrite GPS and engine diagnostic data every 30 days and driver electronic log data every 180 days.

144. The Federal Motor Carrier Safety Regulations, 49 C.F.R. § 395.8(k), require a motor carrier to retain driver records of duty and supporting documents for at least 6 months from the date of receipt. Because the operator is not notified in a timely manner of a CACP complaint, the operator cannot take appropriate steps to preserve the electronic record. The operator also loses the opportunity to promptly investigate and preserve evidence from the time the summons is issued.

145. The delayed service and prosecution of CACP summonses, together with the foreseeable loss of material evidence, deprives the TANY Plaintiffs of a meaningful opportunity to be heard at a meaningful time, violating the Due Process Clauses of the New York State Constitution and the Fourteenth Amendment to the United States Constitution.

146. Defendants are aware of industry-standard data retention limits yet continue to use a "wait-and-purge" service strategy. This approach effectively deprives the TANY Plaintiffs of their "best evidence" defense, forcing them to rely on drivers' faded memories of operating numerous vehicles over the past year.

147. Significantly, the Defendants face no consequences for their delays. OATH hearing officers adjudicate the CACP complaint irrespective of the delay periods, and the prejudice the TANY Plaintiffs suffer as a result is not addressed by the tribunal.

148. The prejudicial effects of delayed enforcement are compounded by the CACP structure, which incentivizes private complainants to submit allegations without corresponding obligations to preserve or provide complete evidentiary context, thereby increasing the risk of altered, incomplete, and/or unbalanced records at the time of adjudication.

149. Upon information and belief, the City of New York knows that privately owned motor carriers rely on this digital evidence and is fully aware of the extended delay in serving CACP summons. Given the City's awareness of these issues, the service delays cannot be anything other than deliberate.

150. The requirements of due process depend on the nature of the interest at stake and the weight of that interest, balanced against the government's opposing interests. The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner. In this case, the City of New York prosecutes when the data becomes unrecoverable and exculpatory evidence is lost and unavailable, effectively shifting the burden of proof onto the TANY Plaintiffs.

151. The City of New York is intentionally bypassing the TANY Plaintiffs' "best evidence" in favor of "Citizen Video," which is often edited, grainy, or lacks context about the truck's mechanical needs, about loading and unloading, and about operating refrigeration and/or other processing devices.

152. As a direct result of these delays, the TANY Plaintiffs are seriously prejudiced in their ability to investigate and defend against the allegations, including but not limited to the following:

- the inability of drivers to remember the specific details of the alleged incident due to the long delay
- the inability to identify the driver responsible for a specific alleged violation due to, among myriad other things, drivers no longer being employed
- the loss or overwriting of current business records, including telematics data, GPS logs, dispatch records, and onboard video, in the normal course of business
- the unavailability of witnesses and supporting evidence
- the inability to effectively challenge selective and incomplete video submissions from citizen complainants

153. These delays significantly undermine the accuracy, reliability, and fairness of the adjudication process before OATH.

154. Defendants have not implemented sufficient safeguards to mitigate the prejudice caused by delayed enforcement, including the need for prompt service and evidence preservation.

155. The delayed enforcement regime violates fundamental due process principles, including the right to a fair opportunity to be heard at an appropriate time.

156. Unlike typical administrative delays, the CACP structure:

a. couples delay with bounty-driven enforcement incentives, and

b. shifts the evidentiary burden onto respondents who are deprived of timely access to exculpatory evidence.

157. Taken together, the delayed service of summonses, the predictable loss of exculpatory evidence, and the structure of the CACP enforcement regime create a constitutionally

deficient process that fails to afford the TANY Plaintiffs a fair and meaningful opportunity to defend against alleged violations.

158. The prejudice described herein is foreseeable and systemic, given the known industry record-retention limitations and Defendants' consistent delays in service, yet Defendants have not adopted procedures to mitigate such prejudice.

159. This process supports an unconstitutional deprivation of procedural due process under the New York State Constitution and the Fourteenth Amendment to the United States Constitution.

WHEREFORE, the TANY Plaintiffs request judgment against Defendants on Count II, together with declaratory and injunctive relief, compensatory damages for the Motor-Carrier Plaintiffs, attorneys' fees, and costs under 42 U.S.C. § 1988, and any other relief the Court deems appropriate.

**THIRD CLAIM**
42 U.S.C. § 1983 – Substantive Due Process
(Against All Defendants)

160. The TANY Plaintiffs repeat and reallege each and every allegation of the preceding paragraphs as though set forth herein at length and make the same a part hereof.

161. This claim is brought under 42 U.S.C. § 1983 to address the deprivation, under color of state law, of rights protected by the Due Process Clauses of the New York State Constitution and the Fourteenth Amendment to the United States Constitution.

162. Defendants have engaged in arbitrary and irrational enforcement conduct by aggressively prosecuting CACP violations and imposing penalties against privately owned motor carriers while simultaneously nullifying enforcement actions against public-sector entities through administrative dismissal.

163. Effectively, the City of New York has outsourced its police power to profit-seeking private individuals, leaving it without oversight.

164. The striking difference in enforcement outcomes—thousands of dollars in penalties for privately owned motor carriers versus dismissals or declinations to prosecute for publicly owned/operated fleets—reflects conduct that is deeply unfair.

165. Defendants' enforcement scheme is arbitrary, irrational, and conscience shocking because it:

- Encourages profit-driven enforcement by private citizens which can lead to corruption
- Imposes punitive consequences disconnected from legitimate regulatory objectives
- Disproportionately burdens interstate carriers

- Operates as a revenue-generating mechanism for the City and the private-citizen bounty hunters rather than a scheme narrowly tailored to any legitimate governmental purpose of reducing pollution

- Impedes the intended goal of reducing unnecessary idling as carriers lose the ability to coach drivers and take corrective action due to the delays in receiving the summonses
- Idle limits are often objectively impossible to comply with given operational circumstances that exist

166. Such conduct violates substantive due process.

167. Defendants' actions are not justified by legitimate government goals and instead reveal favoritism, bias, and improper policy considerations.

168. The failure to carve out an exception or safe harbor for Certified Clean Idle vehicles, together with the lack of enforcement against non-exempt vehicles in public fleets, which are subject to the same Idling Law, shows that the City's goal is not about "clean air" (since a Certified Clean Idle vehicle produces no emissions while operating at idle, and city owned/operated vehicles that are not Certified Clean Idle pollute as much as a privately owned/operated truck), but about generating revenue. If the goal were environmental, Certified Clean Idle vehicles would be exempted and the owner/operator of the fleet would not matter in any prosecution regarding emissions.

169. As a direct result, TANY Plaintiffs have been deprived of their right to fair and impartial government treatment, violating substantive due process.

WHEREFORE, the TANY Plaintiffs request judgment against Defendants on Claim III, together with declaratory and injunctive relief, compensatory damages, attorneys' fees, and costs under 42 U.S.C. § 1988, and any other relief the Court deems just and proper.

**FOURTH CLAIM**
**Equal Protection Clause – Selective Enforcement**
**42 U.S.C. § 1983**
**(Against All Defendants)**

170. The TANY Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

171. This claim is brought under 42 U.S.C. § 1983 for the deprivation, under color of state law, of rights secured by the Fourteenth Amendment's Equal Protection Clause and the Equal Protection Clause of the New York State Constitution. Defendants have adopted and enforced an ownership-based CAC/OATH monetary enforcement policy that treats trucks owned or operated by privately owned motor carriers differently from similarly situated city- and state- owned or operated fleets.

172. The TANY Plaintiffs are private owners and operators of trucks and delivery vans powered primarily by internal combustion engines in New York City.

173. City and state fleets, including MTA/TA buses as described in DEP's published guidance, own and/or operate non-emergency buses or heavy-duty vehicles within the same jurisdiction and are similarly situated in material respects relevant to the enforcement of § 24-163 and § 24-182.

174. Defendants have adopted, announced, implemented, and enforced a policy under which private owners and/or operators are subjected to CAC/OATH monetary enforcement, while city and state owned or operated fleets are declined to prosecute or administratively dismissed from that enforcement.

175. Thus, a vehicle owner that leases its fleet to private operators can be subjected to CAC/OATH monetary enforcement while another owner that leases the exact same type of fleet to the City or State is administratively exempt from the same enforcement.

176. That differential treatment turns on public/private operational status rather than on any material difference in vehicle type, operational setting, or statutory text.

177. DEP's published statements that city and state vehicles are "subject to the idling regulations" but, upon information and belief, are administratively dismissed based on an internal decision and not subject to OATH penalties reflect an official policy of unequal enforcement.

178. Sections 24-163 and 24-182 do not authorize Defendants to create a public/private ownership carveout from OATH monetary penalties for non-emergency city and state fleets.

179. The TANY Plaintiffs and public fleets are similarly situated in material respects because they operate combustion-engine vehicles in New York City, use the same streets and curb space, engage in substantially similar loading, unloading, staging, and stop-related conduct, and, on the face of the statute, are subject to the same idling restrictions unless a valid statutory exemption applies.

180. Upon information and belief, during the relevant period, Defendants issued tens of thousands of CACP summonses to privately owned motor carriers, including the TANY Plaintiffs and other similarly situated interstate transportation companies that provide service to New York City.

181. In contrast, CACP summonses issued to publicly owned, municipally affiliated, or politically favored fleet owners or operators are routinely declined to prosecute on an ad hoc basis or dismissed administratively without adjudication, penalties, adverse findings, or fines.

182. Public and government-affiliated fleet operators are similarly situated to the TANY Plaintiffs in all material respects, including but not limited to:

•Ownership and/or operation of commercial vehicle fleets is subject to the same CAC provisions

•Engagement in substantially identical transportation activities

•Operation within the same geographic and regulatory jurisdiction

•Despite this equivalence, Defendants have consistently declined to enforce CAC penalties against such public or favored entities

183. The selective enforcement scheme is a deliberately adopted public policy, not the result of random errors or isolated discretion, and is not a permitted exclusion to enforcement under the Idling Law.

184. Defendants lack a rational basis for imposing recurring monetary penalties on private owners or operators while shielding similarly situated city and state fleets from comparable OATH monetary enforcement.

185. Alternatively, Defendants' differential treatment is motivated by favoritism, protectionism, revenue-generating incentives, hostility toward private operators or those operating interstate, or a desire to confer regulatory and economic advantages on publicly owned or preferred fleets.

186. Defendants' actions lack any rational basis and are undertaken to confer economic and regulatory advantages on public-sector or politically favored operators.

187. Defendants' enforcement policy imposes disproportionate burdens on private interstate and intrastate carriers, threatening the carriers' ability to continue delivering interstate and intrastate transportation service to New York City.

188. As a direct result, the TANY Plaintiffs have experienced unequal treatment under the law, violating the Equal Protection Clause of the New York State Constitution and the Fourteenth Amendment to the United States Constitution.

189. Defendants' conduct violates the Equal Protection Clause of the Fourteenth Amendment and 42 U.S.C. § 1983.

WHEREFORE, the TANY Plaintiffs request judgment against Defendants on Count IV, along with declaratory and injunctive relief, damages for loss, attorneys' fees, and costs under 42 U.S.C. § 1988, and such other relief the Court deems appropriate.

**FIFTH CLAIM**
**Dormant Commerce Clause**
**42 U.S.C. § 1983**
**(Against All Defendants)**

190. The TANY Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

191. The TANY Plaintiffs bring this claim under 42 U.S.C. § 1983 to enforce rights secured by the United States Constitution's Commerce Clause.

192. The TANY Plaintiffs are interstate motor carriers engaged in transporting property across state lines, including regular operations into and out of New York City.

193. The Commerce Clause prohibits state and local laws and enforcement practices that discriminate against interstate commerce or that impose burdens on interstate commerce that are excessive relative to putative local benefits.

194. Defendants' CACP enforcement practices impose substantial financial and operational burdens on privately owned interstate motor carriers.

195. At the same time, Defendants' policies shield publicly owned or affiliated fleets from comparable monetary penalties through administrative dismissal or ad hoc declinations to prosecute.

196. This differential treatment alters the competitive conditions under which interstate carriers operate in New York City.

197. This imbalance:

- Raises the operating costs for interstate carriers
- Shields local and public competitors from equivalent regulatory burdens
- Distorts market competition within the jurisdiction

198. The burdens imposed by Defendants' enforcement practices are substantial, including recurring fines, administrative costs, and operational constraints.

199. In practice, the enforcement regime favors publicly owned/operated or locally affiliated transportation providers over privately owned interstate carriers.

200. The cumulative effect of repeated monetary penalties and enforcement costs significantly increases the cost of operating interstate trucking services in and around New York City. Those penalties also undercut established interstate operational practices. Hundreds of thousands of vehicles enter the thousands of miles of roadways across New York City every day. On information and belief, the City has in practice used the Idling Law to force companies to electrify their fleets, change their compliance systems, and to alter their routes.

201. To the extent Defendants assert local environmental or regulatory interests, those interests can be advanced through nondiscriminatory enforcement of the Idling Law.

202. Defendants' current enforcement practices impose burdens on interstate commerce that are disproportionate to any legitimate local benefit. Indeed, upon information, most of the summonses being issued in the CACP are in locations outside of those areas where asthma rates are the highest.

203. Less discriminatory and more uniform enforcement alternatives are readily available. The enforcement scheme functions as a de facto protectionist measure, favoring in-state or publicly affiliated entities over private, interstate participants.

204. The challenged enforcement regime increases costs for interstate carriers while conferring relative economic advantages on publicly owned or affiliated fleets.

205. This differential treatment distorts competition in New York City's transportation market.

206. The resulting burden on interstate commerce is both substantial and persistent.

207. The cumulative weight of these fines functions as a 'tax' on entering New York City, which does not apply to local municipal fleets. The fines of $350–$2,000+ create a price-floor disadvantage for interstate carriers competing for contracts against local or "shielded" entities.

208. At the same time, the enforcement regime used by Defendants confers a relative economic advantage on publicly owned/operated or favored fleets by shielding them from comparable OATH monetary penalties under the same facially applicable law.

209. As alleged above, Defendants disproportionately impose these burdens on privately owned interstate carriers, while publicly owned or affiliated fleets are protected from monetary penalties through administrative dismissal of summonses.

210. This differential enforcement results in practical discrimination against interstate commerce in the following ways:

- Increasing the operating costs for interstate carriers
- Providing a financial advantage to publicly owned local transportation providers
- Distorting competition in the transportation market

211. The burdens imposed on interstate commerce are clearly excessive relative to any purported local benefit, particularly where:

- Identical or substantially similar conduct by publicly owned fleets is not penalized
- Less discriminatory alternatives to enforcement are available

212. The extent the Defendants' enforcement regime, in practice, discriminates between privately owned interstate carriers and public or locally protected fleets, that discrimination is not

justified by any legitimate local interest that cannot be achieved through reasonable, nondiscriminatory alternatives.

213. As a direct result of Defendants' conduct, the TANY Plaintiffs have suffered and continue to suffer pecuniary losses, competitive harm, and operational disruption.

214. The TANY Plaintiffs are entitled to declaratory and injunctive relief. As a direct and immediate result of Defendants' actions, the TANY Plaintiffs have suffered and continue to suffer pecuniary losses, competitive harm, business disruption, and irreparable harm.

WHEREFORE, the TANY Plaintiffs request judgment against Defendants on Count V, together with declaratory and injunctive relief, compensatory damages for the Motor-Carrier Plaintiffs, attorneys' fees and costs under 42 U.S.C. § 1988, and any other relief the Court deems just and proper.

**SIXTH CLAIM**
**Supremacy Clause / Federal Preemption**
**Declaratory and Injunctive Relief**
**(Against All Defendants)**

215. The TANY Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein at length and make the same a part hereof.

216. The TANY Plaintiffs' operations are subject to environmental regulations promulgated by EPA and safety regulations promulgated by OSHA and FMCSA.

217. These regulations require drivers and carriers to ensure that drivers take steps necessary to allow EPA-approved pollution control functions to operate, to protect themselves from heat-related illness in their workplace, and to observe service-hour limitations that assure the adequate rest necessary for the safe operation of their vehicles.

218. In certain operational contexts, compliance with federal environmental and safety requirements requires that a truck engine remain running to support essential systems, such as regeneration to burn off accumulated toxic soot (turning it into harmless ash) and operation of HVAC and related onboard electrical service.

219. Defendants' enforcement of the Idling Law penalizes engine operation that may be reasonably necessary to comply with federal environmental and safety requirements.

220. In those circumstances, motor carriers face conflicting obligations: compliance with local idling restrictions or with federal environmental and safety standards.

221. This conflict creates an impermissible obstacle to achieving and implementing federal regulatory objectives.

222. To the extent Defendants impose penalties for conduct reasonably necessary to comply with federal environmental and safety obligations, such enforcement is preempted by the Supremacy Clause.

223. Because the CACP penalizes conduct that is physically necessary to participate in EPA programs and comply with FMCSRs, it obstructs the achievement and implementation of Congress's full purposes and objectives in interstate motor carrier safety and is therefore preempted by those regulations.

224. 49 C.F.R. § 395 (Hours of Service) requires drivers to ensure minimum down time to obtain adequate rest. During that time, idling can be necessary for the vehicles HVAC and electric system to maintain a safe and adequate cab temperature to allow for adequate rest and to operate necessary medical equipment, such as CPAP machines.

225. The City of New York's enforcement forces drivers to choose between impossible choices. Under the Supremacy Clause, federal law must prevail.

226. Imposing CACP/OATH penalties for conduct reasonably necessary to participate in EPA programs and comply with OSHA and FMCSA safety requirements conflicts with federal law and obstructs Congress's goals in regulating interstate motor carriers.

227. The Clean Air Act ("CAA") independently preempts the Idling Law because the Idling Law is a backdoor attempt to implement preempted emissions standards. The CAA prohibits municipalities from enforcing "any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines." 42 U.S.C. § 7543(a). The Idling Law prohibits the idling of "the engine of a motor vehicle." And on information and belief, the City has in practice used the Idling Law to force companies to electrify their fleets—effectively implementing a zero-emissions-standard—in contravention of the CAA.

228. The Federal Aviation Administration Authorization Act ("F4A") also preempts the Idling Law. The F4A preempts state or local laws "related to a price, route, or service" of any motor carrier or broker "with respect to the transportation of property." 49 U.S.C. § 14501(c)(1).

The Idling Law has a significant impact on motor carrier prices, routes, and services. Drivers frequently leave delivery vehicles idling while they work in the cargo area to stage deliveries. In extreme temperatures, prohibiting idling could expose drivers to unsafe conditions and force changes to delivery services, including staging, loading, unloading, cargo handling, refrigeration, and route continuation. Moreover, the City's use of the Idling Law to force companies to electrify their fleets necessarily affects prices, and because not all delivery routes have EV charging stations, carriers would be forced to change routes to account for EV infrastructure.

229. The TANY Plaintiffs lack an adequate remedy at law to prevent ongoing enforcement that conflicts with federal law.

230. Plaintiffs are entitled to declaratory and injunctive relief enjoining enforcement generally, as applied to the TANY Plaintiffs, and as applied to TANY's members.

WHEREFORE, The TANY Plaintiffs request judgment against Defendants on Claim VI, declaring the challenged enforcement regime preempted to the extent of any conflict, enjoining its further enforcement in that manner, and awarding such other relief as the Court deems just and proper.

**SEVENTH CLAIM**
**Municipal Liability**
**Monell v. Department of Social Services**
**42 U.S.C. § 1983**
**(Against Defendant City of New York)**

231. The TANY Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein and make the same a part hereof.

232. The constitutional violations alleged herein were caused by the City of New York's official policies, practices, and customs.

233. These policies include administering the CACP and handling enforcement actions against distinct categories of vehicle operators.

234. Defendants have publicly articulated enforcement practices under which certain categories of vehicles are not subject to monetary penalties in OATH proceedings.

235. These practices are implemented consistently and reflect decisions made by final policymakers in the DEP.

236. The enforcement pattern described herein is widespread and persistent. The City of New York has continued these practices despite the foreseeable risk of constitutional violations.

237. These policies include, but are not limited to:

- The systematic issuance of CACP summonses against privately owned motor carriers
- The routine administrative dismissal of summonses issued to public or government-affiliated fleets
- The unequal prosecution of enforcement actions, without regard to whether the named respondent is actually responsible, based on operator status or identity, rather than on conduct

238. Upon information and belief, these policies were:

- Directed, approved, or knowingly tolerated by senior officials, including the DEP Commissioner
- Implemented consistently across numerous cases over an extended period of time

239. The challenged practices constitute official policy or custom within the meaning of § 1983.

240. The City of New York has acted with deliberate indifference to the TANY Plaintiffs' constitutional rights.

241. The City of New York is therefore liable for the TANY Plaintiffs' injuries.

242. While, upon information and belief, about 95% of private CACP summonses result in fines, all public fleet summonses are either dismissed or excused from prosecution through internal administrative “voiding” before they reach an OATH hearing. This shows that the 'policy' itself is discriminatory.

243. The pattern of thousands of enforcement actions against privately owned motor carriers in violation of their constitutional rights, coupled with the absence of sustained enforcement against public fleets, constitutes a widespread and persistent practice sufficient to establish municipal liability. Defendants’ failure to correct or prevent these practices demonstrates deliberate indifference to constitutional rights.

244. The City of New York intentionally upheld and enforced these policies and practices despite being aware of the clear and predictable risk that they would infringe on the TANY Plaintiffs’ constitutional rights.

245. The City of New York is responsible for constitutional injuries inflicted on the TANY Plaintiffs by its agencies, officials, and final policymakers.

WHEREFORE, the TANY Plaintiffs request judgment against Defendant City of New York on Claim VII, together with compensatory damages, declaratory and injunctive relief, attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and any other relief the Court deems just and proper.

**EIGHTH CLAIM**
**Declaratory Relief**
**28 U.S.C. §§ 2201 and 2202**
**(Against All Defendants)**

246. The TANY Plaintiffs repeat and reallege each of the allegations of the preceding paragraphs as if fully set forth herein at length and make the same a part hereof.

247. An actual controversy exists over the legality of Defendants' enforcement practices.

248. The TANY Plaintiffs contend that these practices violate the New York State and United States Constitutions and state and federal law.

249. The TANY Plaintiffs are entitled to a declaration of their rights and a declaration of the illegality of Defendants' conduct.

250. The CACP's use of bounty hunters, coupled with substantive and administrative procedures that fail to provide the TANY Plaintiffs with a meaningful opportunity to confront their accusers and defend themselves, is causing the TANY Plaintiffs to face ongoing and irreparable harm which requires injunctive relief.

251. Monetary damages alone are insufficient to remedy these harms.

252. The balance of equities favors the TANY Plaintiffs.

253. The public interest supports uniform, constitutional enforcement of regulatory laws.

254. The TANY Plaintiffs are entitled to injunctive relief that prohibits the challenged practices.

255. The TANY Plaintiffs contend that the selective enforcement practices described herein violate the following:

- The Equal Protection Clauses of the New York State and United States Constitutions

- The Dormant Commerce Clause of the United States Constitution
- The Supremacy Clause of the United States Constitution
- The Due Process Clauses of the New York State and United States Constitutions

256. Defendants continue to enforce the CACP in a discriminatory manner, causing the TANY Plaintiffs ongoing harm.

257. The TANY Plaintiff is entitled to a declaration that Defendants' policies, practices, and customs are unlawful and unconstitutional.

WHEREFORE, the TANY Plaintiffs request a declaration that the challenged policies and practices of Defendants are unlawful and unconstitutional, along with further relief under 28 U.S.C. §§ 2201 and 2202.

**NINTH CLAIM**
**Permanent Injunctive Relief**
**(Against All Defendants)**

258. The TANY Plaintiffs repeat and reallege each and every allegation of the preceding paragraphs as though set forth herein at length and make the same a part hereof.

259. Defendants challenged conduct has caused, and unless enjoined will continue to cause, the TANY Plaintiffs' immediate and irreparable harm, including ongoing financial harm, operational disruptions, competitive disadvantages, and burdens on interstate commerce operations that cannot be fully remedied by monetary damages alone.

260. The TANY Plaintiffs lack an adequate legal remedy to prevent the continued and future enforcement of Defendants' unconstitutional and preempted policies and practices, and regime.

261. The balance of hardships favors the TANY Plaintiffs and leans decisively in their favor.

262. The public interest favors enjoining unconstitutional, discriminatory, and federally preempted local enforcement policies and practices.

263. The TANY Plaintiffs face ongoing and irreparable harm, including:

- Continued exposure to unlawful and discriminatory enforcement
- Competitive disadvantage
- Economic losses not fully compensable by damages

264. The Defendants have no legitimate interest in preserving an unconstitutional enforcement scheme.

265. The public interest is served by ensuring the fair, uniform, and constitutional enforcement of regulatory laws.

266. The TANY Plaintiffs therefore seek injunctive relief requiring Defendants to:

- Cease enforcement practices through financially incentivized bounty-hunters
- Apply CACP provisions equally to all similarly situated entities
- Prohibit administrative dismissal policies that favor public-sector or politically connected operators

267. The TANY Plaintiffs are therefore entitled to permanent injunctive relief prohibiting Defendants from continuing to enforce the Idling Law regime through the challenged unequal, unlawful, and preempted policies and practices.

WHEREFORE, the TANY Plaintiffs request a permanent injunction prohibiting Defendants from enforcing the challenged regime described herein generally and as applied to the TANY Plaintiffs and to TANY's members, together with any other relief the Court deems just and proper.

**TENTH CLAIM**
**42 U.S.C. § 1983 – Class-of-One Equal Protection**

268. The TANY Plaintiffs repeat and reallege each of the allegations in the preceding paragraphs as if fully set forth herein and make the same a part hereof.

269. The TANY Plaintiffs have been intentionally treated differently from others similarly situated, namely, public and government-affiliated fleet operators.

270. No rational basis exists for the differential treatment.

271. This differential treatment caused Plaintiffs economic harm.

272. Defendants' conduct violates the Equal Protection Clause.

WHEREFORE, the TANY Plaintiffs request a permanent injunction preventing Defendants from enforcing the challenged regime described herein, along with any other relief the Court finds just and proper.

**ELEVENTH CLAIM**
**State Law Claim – Administrative Fairness / Arbitrary and Capricious Enforcement**
**(New York Common Law / Article 78 Principles)**
**(Against All Defendants)**

273. The TANY Plaintiffs repeat and reallege each allegation in the preceding paragraphs as if fully set forth herein and make the same a part hereof.

274. Defendants' enforcement practices are arbitrary, capricious, and inconsistent with the principles of administrative fairness under New York law.

275. Such practices lack a rational basis and are applied inconsistently.

276. The TANY Plaintiffs are entitled to appropriate equitable relief under state law.

277. This Court has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367.

278. Under New York law, governmental action must not be arbitrary, capricious, irrational, or undertaken without a rational basis.

279. Administrative enforcement actions must be applied consistently and without discrimination and must bear a rational relationship to the purposes of the governing statute.

280. Defendants' enforcement of New York City Administrative Code § 24-163 through the CACP is arbitrary and capricious because it:

(a) Applies materially different enforcement outcomes to similarly situated vehicle operators based solely on the TANY Plaintiffs' ownership status (public versus private).

(b) Relies on a publicly articulated policy under which certain categories of vehicles are not subject to monetary penalties in OATH proceedings.

(c) Permits systemic delay in the service of summonses that foreseeably results in the loss of relevant and potentially exculpatory evidence;

(d) Relies on tech-based complaints without guardrails to assure veracity and integrity of the evidence; and

(e) Imposes penalties through procedures that do not reasonably account for the operational and evidentiary realities of the regulated industry.

281. These practices are not the result of isolated discretion but reflect consistent, ongoing administrative conduct in implementing the CACP enforcement regime.

282. Defendants' actions lack a rational basis and are inconsistent with the Idling Law's stated purposes, including uniform environmental enforcement.

283. Defendants' enforcement practices are therefore arbitrary, capricious, and contrary to law under New York administrative law principles.

284. The TANY Plaintiffs have suffered and continue to suffer harm as a direct result of these unlawful practices, including financial losses, operational disruptions, and competitive disadvantages.

285. The arbitrary and inconsistent enforcement practices described herein undermine the uniform application of the Idling Law and erode the predictability that regulated entities need to conform their conduct to governing standards.

286. The TANY Plaintiffs lack an adequate remedy at law for the ongoing application of these practices.

287. The TANY Plaintiffs are entitled to declaratory and injunctive relief under New York law to prevent further arbitrary and capricious enforcement.

WHEREFORE, Plaintiffs request this Court:

a. Declare that Defendants' enforcement practices are arbitrary and capricious under New York law.

b. Enjoin Defendants from continuing such practices generally and as applied to the TANY Plaintiffs and to TANY's members.

c. Grant such other relief as the Court deems appropriate.

**TWELFTH CLAIM**
**PRAYER FOR RELIEF**

WHEREFORE, the TANY Plaintiffs repeat and re-allege each and every allegation set forth in the foregoing claims of this complaint as though set forth herein at length, make the same a part hereof, and respectfully request that this Court to enter judgment in their favor and against Defendants on all counts and grant the following relief:

A. Declare that the CACP and Defendants' enforcement practices violate the New York State and United States Constitutions.

B. Declare that the CACP and such practices are preempted by federal law.

C. Enjoin Defendants from enforcing the challenged practices generally and as applied against TANY and TANY's members.

D. Award compensatory damages in favor of the Motor-Carrier Plaintiffs.

E. Award attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

F. Award such other relief as the Court deems appropriate.

## VI. JURY DEMAND

The TANY Plaintiffs hereby demand a jury trial on all issues triable to a jury.

Dated: September 11~~July 8~~, 2026
Albany, New York

**MONACO COOPER LAMME & CARR, PLLC**

By: ______________________________

Brian D. Carr, Esq.
Bar Roll: BC2323
James P. Lagios, Esq.
Bar Roll: 511501
Attorneys for Plaintiffs
1881 Western Avenue, Suite 200
Albany, NY, 12203
Tel: (518) 855-3535
Fax: (518) 855-3536
bcarr@mclclaw.com
jlagios@mclclaw.com

**EXHBIT A**

**RDS DELIVERY SERVICE CO., INC.**

**OATH SUMMONS HISTORY**

| OATH Summons # | Date of Alleged Violation | Hearing Date | Days Between Violation and Hearing | Amount | Escalated Fine (> $350) |
|---|---|---|---|---|---|
| 000955750Z | 10/4/2024 | 3/17/2026 | 529 | $2,400.00 | YES |
| 000881944H | 9/10/2024 | 12/10/2025 | 456 | $1,300.00 | YES |
| 000941794N | 8/22/2024 | 1/27/2026 | 523 | $1,300.00 | YES |
| 000866664H | 3/25/2024 | 10/1/2025 | 555 | $1,300.00 | YES |
| 000887976J | 3/8/2024 | 10/26/2026 | 962 | $1,100.00 | YES |
| 000861315R | 2/12/2024 | 1/13/2026 | 701 | $1,950.00 | YES |
| 000812762H | 10/4/2023 | 9/5/2024 | 337 | $2,600.00 | YES |
| 000912633J | 6/14/2024 | 7/11/2025 | 392 | $1,300.00 | YES |
| 000912073K | 10/25/2024 | 7/9/2025 | 257 | $1,950.00 | YES |
| 000862975R | 7/14/2024 | 9/24/2025 | 437 | $1,300.00 | YES |
| 000915811R | 12/19/2024 | 11/26/2025 | 342 | $1,300.00 | YES |
| 000832958H | 1/26/2024 | 5/12/2025 | 472 | $1,300.00 | YES |
| 000830774Y | 2/14/2024 | 1/23/2025 | 344 | $455.00 | YES |
| 000977600K | 12/27/2024 | 5/14/2026 | 503 | $350.00 | NO |
| 000877370X | 2/29/2024 | N/A | N/A | $600.00 | YES |
| 000980121K | 1/7/2025 | 5/21/2026 | 499 | $350.00 | NO |
| 000912731N | 6/20/2024 | 7/11/2025 | 386 | $350.00 | NO |
| 000918353M | 1/3/2025 | 8/18/2025 | 227 | $350.00 | NO |
| 000805290N | 8/18/2023 | 7/2/2024 | 319 | $350.00 | NO |
| 000832801J | 2/22/2024 | N/A | N/A | $350.00 | NO |
| 000847770H | 12/29/2023 | N/A | N/A | $350.00 | NO |
| 000712600R | 3/28/2022 | N/A | N/A | $1,300.00 | YES |
| 000774190R | 4/27/2023 | N/A | N/A | $720.00 | YES |
| 000766680J | 3/20/2023 | N/A | N/A | $1,300.00 | YES |
| 000724623H | 7/11/2022 | N/A | N/A | $1,300.00 | YES |
| 000707814X | 12/27/2021 | N/A | N/A | $1,000.00 | YES |
| 000705891K | 11/26/2021 | N/A | N/A | $1,300.00 | YES |
| 000703265Y | 10/13/2021 | N/A | N/A | $350.00 | NO |
| 000703151X | 5/17/2021 | N/A | N/A | $455.00 | YES |
| 000671091J | 1/24/2020 | N/A | N/A | $1,400.00 | YES |
| | | Grand Total Paid: | | $31,730.00 | |